**BANCO NACIONAL DE COMERCIO EXTERIOR, S. A. et al.**

v.

**FIRST NAT. BANK AT BROWNS-VILLE, TEX. et al.**

**No. 14703.**

United States Court of Appeals Fifth Circuit.

April 9, 1954.

Rehearing Denied May 3, 1954.

Petition for Further Rehearing and Motion for Further Argument Denied May 25, 1954.

Fred B. Wagner, Brownsville, Tex., Cox, Wagner, Adams & Wilson, Brownsville, Tex., of counsel, for appellant.

M. S. McCorquodale, Houston, Tex., C. S. Eidman, Jr., Brownsville, Tex., Fulbright, Crooker, Freeman & Bates, Chas. M. Haden and Quentin Bates, Houston, Tex., for appellee Anderson, Clayton & Co. Inc.

Herbert Davenport, Davenport & Ransome, Brownsville, Tex., for appellee First Nat. Bank at Brownsville, Tex.

Before HUTCHESON, Chief Judge, and HOLMES and BORAH, Circuit Judges.

HOLMES, Circuit Judge.

In our opinion, a summary judgment should not be given in this case. The subject matter of this suit is a contract, made in the autumn of 1947, between appellants, Mexican corporations, as sellers, and Anderson, Clayton & Company, Inc., one of the appellees, as buyer, for the sale and delivery of 9810 bales of cotton out of a lot of 11,050 bales, belonging to appellants and stored in warehouses at Brownsville, Texas. The contract is in writing and consists of letters between the buyer and sellers, which followed oral negotiations for the purchase of cotton out of the 11,050 bales above mentioned. The basic or offering letter was written by the buyer, in which the latter confirmed the sale to it by the appellants of 9810 bales of cotton from the 1946 Laguna crop of said 11,050 bales, upon the following terms and conditions:

Mainly strict middling and middling were to be delivered, and only strict low middling necessary to complete the 9810 bales contracted for: the buyer was under obligation to receive not more than 1000 bales of strict low middling. Liquidation was to be according to the quality outturn as follows: strict middling 28.-10¢, middling 27.60¢, strict low middling 26¢, per pound. Delivery was to be at the Brownsville compress, free of country damage and in merchantable condition. There were also provisions for reweighing, resampling, reconditioning, and compressing. The purchaser was to make an advance to the sellers on account of any cotton not received and paid for on October 31st, provided the corresponding warehouse receipts were delivered to the buyer. "In practice," the letter

added, "we think it will be possible to receive approximately 1000 b/c daily and so a relatively small quantity of cotton should remain unpaid on the 31st, especially since, for our part, we will be ready to start to work next Monday."

Other letters were written, which elaborated the conditions of the contract. On the third of November, 1947, the buyer wrote: "In the event that for any reason it should not be possible to deliver to the buyers the total number of bales contracted for, and precisely the classes contracted for, you are obligated to return to us, for crediting to the buyers, whatever part of the advance might be in excess at the time of liquidation—made in advance in this case—of the open account mentioned above, and to return it immediately upon verification of the facts that would justify such liquidation in advance." This was agreed to by Banco Nacional by letter dated November 14, 1947, wherein it was stated: "In the event that the 9,810 b/c cannot be delivered to you in the grades specified in the contract, we agree to return to you whatever part of the advance might be in excess on liquidating the sale, and to return it immediately upon verification of the facts showing that it is due."

Accordingly, the warehouse receipts where delivered by the First National Bank to the buyer, the latter having deposited with it the one million dollars and delivered its trust receipt, all according to the contract except a new provision was inserted in the trust receipt which if valid made a radical change in the prices to be paid. This was that the final classification and weights were to be obtained *on the basis of* the respective prices for the three grades stipulated in the contract. This whole controversy turns upon the validity and effect of this change in the language of the contract. Prior to the delivery of the trust receipt, in its letter of November 3, 1947, the buyer had taken pains to provide expressly that the sellers were obligated to deliver "precisely the classes contracted for," and that if this should not

be possible, the sellers were obligated to return whatever part of the advance might be in excess at the time of the liquidation. The price was to be according to the quality outturn of only three grades. Banco agreed to this in its letter of November 14, 1947, in the event "the grades specified in the contract" could not be delivered.

We think that the buyer had no right to interpolate a new contractual provision in the trust receipt, while the contract was in the process of being performed; nor did it have the right to put a unilateral interpretation upon the contract. This trust receipt was executed as a necessary operation in the delivery of the cotton, and should not be held to be a modification of the contract from one covering three specific grades to a basis contract covering all grades. This trust receipt was executed about a month after the offering letter written by the buyer was agreed to by the seller. The buyer had the right to reject the cotton if not precisely equal to the classifications called for in the contract, but it did not have the right to accept the cotton and put its own price thereon.

One who deals with an agent acts at his peril as to the scope of the agent's authority. The First National Bank of Brownsville was the agent of the sellers, but it had a very limited authority. It was authorized to deliver the warehouse receipts to the buyer in lieu of a trust receipt and the payment of a million dollars, but it had no authority to make a new contract for the parties or to change the old one. It had authority to accept payments of money by the buyer for account of the sellers and to remit the same to its principals through banking channels. All parties knew this or should have known it; and it must be remembered that, at the time the trust receipt was given, the high contracting parties had taken the precaution to reduce their oral agreements to writing and were dealing with each other across international boundaries in the performance of their written contract. The American bank was the financial agent

of a Mexican principal, and it is not remarkable that the bank failed to catch the significance of the potent words of art "on the basis of," which phrase had not previously been used in their correspondence by any of the parties.

In its letter of October 27, 1947, the buyer had offered to accept only three grades of cotton, namely, strict middling, middling, and strict low middling, the price of each grade being specifically stated. In a subsequent letter it had emphasized and reiterated the fact that the seller was obligated to deliver "precisely the classes contracted for," which obligation the sellers had also acknowledged. If the market had declined, it is reasonable to presume that the buyer (as it had the right to do) would have rejected tendered cotton not precisely within the classes called for in the contract. The fact that the market had advanced did not give the sellers the right to tender inferior grades. Inferiority in the grades of cotton tendered was something that the buyer could waive by paying the contract price, but it could not take the cotton at prices fixed by it alone. If the inclusion of the phrase "on the basis of" in the trust receipt was a proposal to modify the contract, this proposal was rejected, since in its reply Banco Nacional instructed its agent to credit its account with the million dollars and to deliver the warehouse receipts "according to our original instructions."

In its brief, the appellee First National Bank says that this is purely a fact case; that the only law involved is the basic concept of the law of contracts: "As a man bindeth himself so shall he be bound." Further, it says that the case is unique in that the only differences pleaded relate to interpretations of the agreement as to the contract price, and that these differences must be resolved by the court as a matter of law. The appellee bank contends that if appellants have no case against Anderson, Clayton & Company, Inc., they have none against the bank, and, if they do have a case against Anderson-Clayton, that hypothesis eliminates the necessity of their alleged claim against the bank. After carefully considering these contentions and the facts that have been pleaded, our conclusion is that the only plausible claim against the bank is that it was negligent in delivering the warehouse receipts to the buyer in exchange for the latter's trust receipt in which was interpolated a new and material contractual proposal, namely, a provision for payment "on the basis of" the contract.

Since we have just held that this unilateral act on the part of the buyer did not change the existing contract or prejudice the sellers' rights, not having been assented to by them, we hold that no case of liability has been made against the bank by the sellers. Nevertheless, at this stage of the litigation, the suit of appellants against the bank should not be terminated by a summary judgment, but should remain pending until the case against Anderson, Clayton & Company has been finally adjudicated. This is a case of an equitable nature, involving intricate and complicated accounts; it is a suit against the buyer to whom warehouse receipts were delivered in trust by the sellers. Control and constructive possession of the cotton followed the warehouse receipts. After they were delivered to the buyer in trust, there was little that the sellers could do about the price other than accept what payments were tendered them and object to the discounts, which they did. There is no controversy here over the grade classifications or over much of anything else except the price; and we agree with the appellees that the prices were fixed in writing, but we disagree with their contention that, as matter of law, the prices were modified by the trust receipt. It was too late to add any new terms to the contract after the delivery of the warehouse receipts, or contemporaneously with their delivery, unless the sellers agreed thereto either expressly or by necessary implication.

The contract was for cotton of three precise, even-running, grades. Since

the buyer was under obligation to receive no more than 1000 bales of strict low middling, the sellers were not obligated to deliver more than that number. The balance of the cotton was to be paid for at 28.10¢ for strict middling and 27.-60¢ for middling. The trust receipt should have provided for the return of the warehouse receipts or, in lieu thereof, for the payment of one million dollars in cash and payment of the balance at contract prices. Equity regards that as done which ought to have been done. So the buyer was obligated to return the warehouse receipts or pay the contract prices for the cotton bought, unless the sellers agreed to a different course. Except as to the 1000 bales of strict low middling, the buyer did not have the right to select from the 11,050 bale lot any other classes of cotton than middling and strict middling. If spotted or tinged cotton of those grades was tendered and accepted, the contract prices applied. Such contract was not ambiguous, and was not modified by the trust receipt unless the contrary is proven in a trial upon the issues made by the pleadings.

The judgment appealed from is reversed, and the cause remanded for further proceedings not inconsistent with this opinion. The costs of this appeal to be taxed against the buyer.

Reversed.

### On Petition for Rehearing by Appellee First National Bank at Brownsville, Texas.

This case is illustrative of how hard it is to please some litigants. Our decision was entirely favorable to the First National Bank at Brownsville, Texas, on the record as it now stands. It was not required to pay even a portion of the costs of appeal. Yet this bank was the first one to file a petition for rehearing, a twenty-page printed petition and brief. Others may have grounds to complain; but, at this stage of the proceeding, the petitioner has none; its petition for rehearing is denied.